UNITED STATES of America, Plaintiff,

v.

Charles Kapela STEVENS, Aletha None Joseph, Lawrence Padilla, Defendants.

UNITED STATES of America, Plaintiff,

v.

John G. CAMBRA, Defendant.

UNITED STATES of America, Plaintiff,

v.

Charles Kapela STEVENS, Roy Kiyoshi Kiyabu, Defendants.

UNITED STATES of America, Plaintiff,

v.

Bruce RAMSEY, Defendant.

Crim. Nos. 91–01618 DAE, 91–01619 HMF, 91–01621–02 ACK and 92–00908 DAE.

United States District Court, D. Hawaii.

Aug. 31, 1992.

Daniel A. Bent by R. John Seibert, Asst. U.S. Atty., Honolulu, Hawaii, for the U.S.

Richard Ney, Federal Public Defender, David Bettencourt, William H. Brady, Honolulu, Hawaii, Philip H. Lowenthal, Wailuki, Hawaii, for Charles Kapela Stevens.

Samuel P. King, Jr., Honolulu, Hawaii, for Aletha None Joseph.

Richard Ney, Federal Public Defender, Rustam Barbee, Asst. Federal Public Defender, Karen S.S. Ahn, Honolulu, Hawaii, for Lawrence Padilla.

Rustam Barbee, Asst. Federal Public Defender, Richard Ney, Federal Public Defender, Rogers Ikenaga, Honolulu, Hawaii, Hayden Aluli, Honolulu, Hawaii, for John G. Cambra.

William A. Harrison, Honolulu, Hawaii, for Bruce Ramsey.

## ORDER DENYING DEFENDANTS' MOTIONS TO SUPPRESS

DAVID ALAN EZRA, District Judge.

This court heard defendants' motions to suppress on August 25, 1992. After reviewing the motions and the supporting and opposing memoranda and hearing witness testimony as well as arguments of

counsel, the court denies the defendants' motions to suppress.

## PROCEDURAL BACKGROUND

On October 11, 1991, defendant Charles Kapela Stevens ("Stevens") and codefendants Aletha None Joseph [1] ("Joseph"), Lawrence Padilla ("Padilla"), Glenn Sequin,[2] and Bruce Ramsey [3] ("Ramsey") were charged with numerous drug-related offenses in a thirty-four count indictment.[4] Cr. No. 91–01618 DAE. On that same day, a grand jury returned a single-count indictment against Stevens and Roy Kiyoshi Kiyabu for conspiracy to possess an unregistered firearm, Cr. No. 91–01621 ACK, and a single-count indictment against John G. Cambra ("Cambra") for illegal use of a communication facility, Cr. No. 91–01619 HMF.

On May 11, 1992, Stevens filed a motion to suppress fruits of unlawful interception of wire communications. Stevens' motion to suppress the recorded telephone conversations is based on the following grounds:

(1) the government failed to establish probable cause that Stevens and the others had been committing the subject drug offenses;

(2) the government failed to establish that traditional investigative techniques were not reasonable and that the wiretap was therefore a "necessity;"

(3) the government failed to properly minimize conversations; and

(4) the Wiretap Order was overbroad.

Joseph, Padilla, Cambra, and Ramsey have all joined in Stevens' motion to suppress

1. Joseph indicates that she has remarried defendant Stevens in Las Vegas, Nevada. To avoid confusion, she will be referred to as Joseph in this order.

2. On May 27, 1992, Glenn Sequin entered a plea of guilty.

3. On June 17, 1992, the government filed a separate first superseding indictment against Bruce Ramsey. Cr. No. 92–00908 DAE. Accordingly, the charges against him in Cr. No. 91–01618 DAE were dismissed on June 26, 1992.

fruits of unlawful interception of wire communications.

On May 22 and 26, 1992, Stevens filed a total of five additional motions to suppress. On May 28, 1992, Padilla joined in one of Stevens' motions and filed another motion to suppress. On May 29, 1992, Joseph joined in some of the motions. The aforementioned motions seek suppression of evidence resulting from the following events:

(1) search of Stevens on March 22, 1990;

(2) statement of Stevens on March 28, 1990;

(3) search of Stevens' residence on October 5, 1990;

(4) search of Padilla's residence on October 23, 1990;

(5) search of Laurie Rellin's residence on March 4, 1991;

(6) interview of Padilla on June 4, 1991; and

(7) removal of listening device(s) from Stevens' residence on October 15, 1991.[5]

## I. MOTION TO SUPPRESS INTERCEPTED WIRE COMMUNICATIONS

### A. Background

On July 16, 1990, the plaintiff United States (the "government") filed an "Application for Interception of Wire Communications" seeking permission to conduct electronic surveillance of the home telephone of defendant Charles Stevens.[6] Gov't Ex. 1. In support of the application, the government submitted an eighty-four page affidavit of Federal Bureau of Investigation ("FBI") Special Agent Michael John Moroney ("Agent Moroney").[7] Gov't Ex. 2.

4. On June 17, 1992, the government filed a first superseding indictment involving thirty-nine counts against Stevens, Joseph, and Padilla.

5. The court notes that Ramsey has also filed two motions to suppress which will be heard separately in connection with his separate trial.

6. The telephone number was (808) 696–2108 and its location was 84–049 Lawaia Street, Waianae, Hawaii. The telephone was registered to Sharon K. Stevens and C. Stevens.

7. At the time of the application, Agent Moroney had been employed with the FBI as a special

In his affidavit, Agent Moroney detailed the reasons supporting the government's assertion that there was probable cause to believe that Stevens and his alleged associates were involved in a drug-distribution conspiracy and that probable cause existed to believe that Stevens' home telephone was being used in connection with the alleged illegal activity. The government's assertion of probable cause was based on the following sources: information provided by sixteen confidential informants; information provided by Paciano "Sonny" Guerrero; information resulting from the arrests, and accompanying searches, seizures, and statements of Thomas D. Titsworth, Stevens, James Caminos, Alvin Sequin, and Narcissa Lemau; and information obtained from a pen register [8] on Stevens' home telephone.

On July 16, 1990, Senior United States District Judge Martin Pence granted the government's application and issued a written "Order Authorizing Interception of Wire Communications" (the "Wiretap Order"). Gov't Ex. 3. Judge Pence determined that there was probable cause to believe that Stevens and many of his alleged associates,[9] have committed, are committing, and will continue to commit offenses involving: possession of controlled substances (cocaine, heroin, and crystal methamphetamine) with intent to distribute; distribution of controlled substances; use of communication facility to facilitate the commission of these offenses; and conspiracy to commit these offenses. Wiretap Order ¶ 1.

Judge Pence also found that probable cause existed to believe that the authorized interception would result in the interception of wire communications concerning the manner, scope, and extent of the activities of Stevens and his alleged organization relating to the aforementioned allegations. Wiretap Order ¶ 2. The Wiretap Order indicated that the communications to be intercepted were expected to concern the dates, places, and methods of distributing the controlled substances. *Id.* Such communications were also expected to reveal places of operation, sources of supply, and the identities of other individuals involved in the alleged drug conspiracy. *Id.*

Additionally, Judge Pence found probable cause to believe that the subject telephone number, (808) 696–2108, has been used, is being used, and will continue to be used by Stevens and his alleged associates in connection with the commission of drug-related offenses. Wiretap Order ¶ 4. Finally, Judge Pence determined that the government had adequately demonstrated that normal investigative procedures were not a reasonable alternative. *Id.* ¶ 3.

The Wiretap Order provided that the FBI, as well as Honolulu Police Department ("HPD") officers under the direct supervision of the FBI, could monitor telephone conversations relating to the alleged drug conspiracy. Wiretap Order at 4–5. The surveillance was authorized to last for thirty days or until the purpose of the surveillance had been fully accomplished, whichever occurred first. *Id.* at 5–6. Judge Pence also required the government to provide him with weekly progress reports. *Id.* at 8.

The FBI commenced the electronic surveillance on July 16, 1990. All law enforcement personnel involved in the surveillance were provided with a comprehensive set of instructions on conducting electronic sur-

---

agent for over twenty-four years. Moroney Aff. ¶ 1. He has supervised the investigation of the offenses and suspects covered by the wiretap application. *Id.*

8. On February 10, 1989, Senior United States District Judge Martin Pence issued an order authorizing the installation of a pen register on Stevens' home telephone. This order was extended eight times.

9. In addition to Stevens, the Wiretap Order named the following family members or alleged associates of Stevens: James "Jimmy" Caminos, Lincoln Caminos, Jr., Alfredo "Maki" Corpuz, Chad Duran, Leroy Holley, Aletha "Terry" Joseph, Jeffrey Joseph, Rodney Joseph, Jr., George "Fluff" Kukila, Pat Lopez, Randy Mousser, Rothwell "Rocky" Naeole, Lorin L. "Lori" Rellin, Rodney Rellin, Wallace "Dido" Rodrigues, Alvin Sequin, Glenn "Whitey" Sequin, Lionel Sequin, Wayne Souza, Aletha "None" Stevens, Richard "Dickie" Stevens, Sharon K. "Sharn" Stevens, and Thomas D. Titsworth. The Wiretap Order also referred to "others as yet unknown."

veillance, including guidelines for minimizing the number and duration of intercepted communications. Gov't Ex. 4. During the thirty-day period prescribed in the Wiretap Order, the government allegedly intercepted 254 telephone calls which pertained to the distribution of controlled substances. Gov't Mem. (Wiretap) at 4.

On August 14, 1990, the government applied for and obtained an order from Judge Pence authorizing the first renewal of interception of wire communications. Gov't Exs. 5, 7. The renewal application, like the original application, was supported by an affidavit of Agent Moroney. Gov't Ex. 6. The government obtained second and third renewal orders on September 13 and October 12, 1990, respectively. Gov't Exs. 8–13. On November 10, 1990, the government terminated the electronic surveillance. Gov't Mem. (Wiretap) at 5. In total, the government monitored approximately 13,-000 telephone calls of which about 700 were deemed pertinent to unlawful activity. *Id.* at 32.

## B. *Franks Hearing*

■ In his moving papers, Stevens requested an evidentiary hearing with respect to his challenge to the Wiretap Order. Stevens Mem. (Wiretap) at 2. The general rule regarding challenges to the facial sufficiency of search warrant affidavits is that evidentiary hearings are impermissible. *Franks v. Delaware,* 438 U.S. 154, 171, 98 S.Ct. 2674, 2684, 57 L.Ed.2d 667 (1978). The rationale behind this rule is that the court reviewing the probable cause determination underlying a search warrant should consider only the information presented to the issuing judge or magistrate. *Spinelli v. United States,* 393 U.S. 410, 413 n. 3, 89 S.Ct. 584, 587 n. 3, 21 L.Ed.2d 637 (1969).

The Supreme Court created an exception to this general rule in *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). In that case, the Court held:

> [W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth,

was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request.

438 U.S. at 155–56, 98 S.Ct. at 2676. Elaborating on its holding, the Court explained:

> There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant. To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant. Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required.

*Id.* at 171–72, 98 S.Ct. at 2684. *Accord United States v. Tham,* 960 F.2d 1391, 1394–96 (9th Cir.1992) (affirming district court's denial of a *Franks* evidentiary hearing); *United States v. Ippolito,* 774 F.2d 1482, 1484–85 (9th Cir.1985) (affirming district court's suppression of wiretap evidence under *Franks* due to intentionally false or misleading statements regarding the Title III necessity requirement in affidavit supporting wiretap application).

■ As indicated in *Franks,* the defendant can challenge the alleged falsity or

reckless disregard of only the affiant, not the informants. 438 U.S. at 171, 98 S.Ct. at 2684. The defendants have challenged only one paragraph of Agent Moroney's eighty-four page affidavit. Stevens Supplemental Mem. at 18–20, 25. In relevant part, Agent Moroney averred:

> *Search Warrants.* No search warrants have been obtained for CHARLIE STEVENS to date in this investigation with the exception of the two State warrants used to search his vehicle and handbag incident to his March 22, 1990 arrest discussed above. *While such search warrants may produce evidence against one or more of the targets, such as drug dealer's records, and possibly some drugs, it is unlikely that this evidence would be sufficient to show the full extent of the STEVENS organization's activities or to identify all participants.* Additionally, a search warrant would likely cause the destruction of evidence located elsewhere, particularly documentation linking the various and numerous narcotics shipments from originating supply sources on the mainland and in foreign countries.

Moroney Aff. ¶ 241(e) (emphasis added). According to Stevens, Agent Moroney's allegations in the aforementioned paragraph were proven false by a small portion of FBI Special Agent Gregg R. Harmon's ("Agent Harmon") fifty-four page affidavit of October 4, 1990 in support of the application for a search warrant for Stevens' residence.[10] Gov't Ex. B. At the suppression hearing, Stevens also alleged that the government had intentionally misled Judge Pence.[11]

In paragraphs 93 through 100 of his October 4, 1990 affidavit, Agent Harmon related his knowledge and experience with the practices of drug traffickers in general. Agent Harmon explained the various types of code words which drug traffickers use to refer to certain drugs and amounts of drugs. Harmon Aff. ¶ 93. Agent Harmon also listed the types of drug-related evidence which is often recovered in a search of the residence of a drug trafficker. *Id.* ¶¶ 94–96, 98, 100. Accordingly, Agent Harmon concluded that a search of Stevens' residence may uncover evidence of drug-related activity, including firearms. *Id.* at 52–52.

The court finds that Agent Moroney did not make any false allegations regarding the feasibility of search warrants in his affidavit in support of the wiretap application. Agent Harmon averred that a search of Stevens' residence would likely uncover

---

**10.** With respect to Stevens' arguments relating to the alleged contradictions in the affidavits of Agents Moroney and Harmon as well as the alleged inconsistencies regarding the usefulness of search warrants, the court notes that these same arguments are relevant to the disposition of other issues, such as the necessity of the wiretap, in these motions to suppress. Thus, for the sake of simplicity, the court will address all of these inconsistency arguments at one time, namely in this section addressing the need for a *Franks* hearing. The court incorporates all of the defendants' arguments relating to the aforementioned alleged contradictions into the present discussion. When the alleged inconsistencies become relevant to other issues in this order, the court will merely make reference to the *Franks* hearing discussion.

**11.** The court notes that Stevens submitted a post-hearing memorandum in which he contends that the FBI, despite knowing as of October 3, 1990, that Stevens had vacated his residence, misrepresented that information to Judge Pence in the October 4, 1990 applications for a search warrant and authorization for lis-

tening device(s) as well as the October 12, 1990 application for a third extension of the wiretap. In support of his alleged departure from the premises and the government's purported knowledge as of *October 3, 1990,* Stevens argues that the government's log sheets indicate that he did not make or receive any calls at his residence on October 2–3, 1990. Stevens further contends that the government intercepted a call on October 3, 1990 in which Terry Joseph called Stevens at the Gonsalves' residence and asked him if he and Joseph were going to return home.

Assuming arguendo that Stevens had vacated his residence prior to October 3, 1990, the court does not find that the aforementioned evidence, if true, indicates that the government had actual knowledge of that situation as of October 3, 1990. At the suppression hearing, the government stated that Stevens immediately left his residence after the search of October 4, 1990. A few days later, however, the government claims that Stevens seemed to indicate that he would return. The evidence further indicates that Judge Pence was apprised of these events in the government's seven-day reports to him.

various types of evidence of drug-related activity. Consistent with Agent Harmon's assertions, Agent Moroney attested that the use of search warrants was not deemed likely to accomplish the investigation's overall objectives. More specifically, Agent Moroney indicated that while a search might reveal discrete evidence of specific drug deals, "it is unlikely that this evidence would be sufficient to show the full extent of the S[tevens] organization's activities or to identify all participants." Moroney Aff. ¶ 241(e).

In further justification of the positions of Agents Moroney and Harmon, the government asserts that one of the primary reasons that the FBI sought a search warrant for Stevens' residence was to allow them to install an electronic listening device, commonly referred to as a "bug," in Stevens' bedroom. On October 4, 1990, the same date that Agent Harmon applied for the search warrant, Agent Moroney submitted an application and supporting affidavit to Judge Pence seeking permission to intercept oral communications regarding Stevens' alleged drug activities. Gov't Ex. F.

In his October 4, 1990 affidavit, Agent Moroney repeated his earlier views that search warrants would have only limited usefulness. Agent Moroney then explained why the FBI was also applying for a search warrant at the same time:

Notwithstanding the foregoing limitations that would likely render execution of a search warrant unsuccessful in achieving the investigation's principal objectives ..., it is contemplated that a search warrant to search the subject residence for evidence of [controlled substance] offenses will be obtained.... While the warrant will be predicated on good and sufficient probable cause, an alternate purpose for obtaining the warrant will be to secure the subject residence in order to install the listening device(s) sought by the accompanying application. While the use of a search warrant to install an authorized listening device(s) has all of the limitations noted ...

above, it is considered the best means of achieving the investigation's overall stated objectives when used in combination with the installation of a listening device(s).

Moroney (Bug) Aff. ¶ 56(e)(iii) (Gov't Ex. F). The preceding excerpt from Agent Moroney's affidavit supporting the listening device(s) application clearly indicates that the FBI was not attempting to deceive Judge Pence; rather the FBI kept Judge Pence fully apprised of the interrelationship of the different components of its investigation of Stevens.

The court does not find the affidavits of Agents Moroney and Harmon to be incompatible. To the contrary, as explained above, the court finds their affirmations to be completely consistent, especially in light of the FBI's alternative purpose for the search warrant relating to the installation of the electronic listening device(s). Therefore, as the court finds that Agent Moroney did not knowingly, or with reckless disregard, make any false statements in his affidavit in support of the wiretap application, the court denies Stevens' request for an evidentiary *Franks* hearing regarding the Wiretap Order.[12]

### C. *Probable Cause*

Electronic surveillance is governed by Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("Title III"), 18 U.S.C. §§ 2510–2521. Section 2518 sets forth the necessary procedures which law enforcement officials must comply with in order to apply for a court order authorizing the interception of wire, oral, or electronic communications.

One of the requirements for such authorization is that the judge must determine, on the basis of facts submitted by the applicant, that:

(a) there is probable cause for belief that an individual is committing, has committed, or is about to commit a par-

---

12. Even if the defendants were able to disprove some of Agent Moroney's statements, a hearing would not be required because there remains more than sufficient other evidence to support a finding of probable cause and necessity. *Franks*, 438 U.S. at 171–72, 98 S.Ct. at 2684.

ticular offense enumerated in section 2516 of this chapter;

(b) there is probable cause for belief that particular communications concerning that offense will be obtained through such interception; ...

(d) ... there is probable cause for belief that the facilities from which, or the place where, the wire, oral, or electronic communications are to be intercepted are being used, or are about to be used in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person.

18 U.S.C. § 2518(3)(a), (b), (d). The standards used for reviewing the probable cause requirements of Title III are essentially the same as those employed for traditional search warrants. *United States v. Brown*, 761 F.2d 1272, 1275 (9th Cir.1985).

The Supreme Court has indicated that probable cause should be determined by a "totality of the circumstances" analysis. *Illinois v. Gates*, 462 U.S. 213, 230–38, 103 S.Ct. 2317, 2328–32, 76 L.Ed.2d 527 (1983); *see also United States v. Tham*, 960 F.2d 1391, 1395 (9th Cir.1992). In *Gates*, the Court noted that "probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." 462 U.S. at 232, 103 S.Ct. at 2329. In adopting the totality of the circumstances test, the Court repeatedly emphasized that it was rejecting any rigid or technical approach to the determination of probable cause. 462 U.S. at 230–38, 103 S.Ct. at 2328–32.

When applying the totality of the circumstances test,

The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*Gates*, 462 U.S. at 238, 103 S.Ct. at 2332. Moreover, the Supreme Court has indicated that " 'only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause.' " *Id.* at 235, 103 S.Ct. at 2330 (quoting *Spinelli v. United States*, 393 U.S. 410, 419, 89 S.Ct. 584, 590, 21 L.Ed.2d 637 (1969)).

■ The task of a court reviewing a probable cause determination is simply to ensure that the issuing judge or magistrate had a *substantial basis* for concluding that probable cause existed. *Gates*, 462 U.S. at 238, 103 S.Ct. at 2332 (emphasis added). The Supreme Court has cautioned:

[A]fter-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review. · A magistrate's "determination of probable cause should be paid great deference by reviewing courts." "A grudging or negative attitude by reviewing courts toward warrants" is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant; "courts should not invalidate warrant[s] by interpreting affidavit[s] in a hypertechnical, rather than a common-sense, manner."

*Id.* at 236, 103 S.Ct. at 2331 (citations omitted); *see also United States v. McQuisten*, 795 F.2d 858, 861–62 (9th Cir.1986).

■ A finding of probable cause by the issuing judge or magistrate must be upheld unless it is clearly erroneous. *McQuisten*, 795 F.2d at 861. Additionally, the Supreme Court has indicated that while determinations of whether an affidavit demonstrates the existence of probable cause will often be difficult, the resolution of doubtful or marginal cases should be determined largely by the preference to be accorded to warrants. *Massachusetts v. Upton*, 466 U.S. 727, 734, 104 S.Ct. 2085, 2088, 80 L.Ed.2d 721 (1984).

■ Turning to the facts of the present case, the court has no trouble in concluding that Judge Pence had a substantial basis for determining the existence of probable cause. Judge Pence's probable cause determination for the initial Wiretap Order was based on the detailed, eighty-four page

affidavit of FBI Special Agent Moroney. Agent Moroney's affidavit recounted numerous and varied sources which indicated that there was more than just a "fair probability" that Stevens and his associates were involved in the distribution of illegal, controlled substances. The sources included: sixteen confidential informants; Paciano "Sonny" Guerrero;[13] information resulting from the arrests, and accompanying searches, seizures, and statements, of Stevens and four of his alleged associates; and information obtained from a pen register on Stevens' home telephone.

The heart of Agent Moroney's affidavit is his description of the information provided by the sixteen confidential sources. The various confidential informants describe the basic framework of Stevens' alleged drug distribution ring. For the most part, the information provided by individual informants is corroborated by the reports of other informants. Most of the informants related personal observations of drug-related activity taken by a number of Stevens' alleged associates named in the Wiretap Order.[14]

Moreover, several of the informants reported direct, personal contact with Stevens on drug-related matters. For example, one of the confidential informants, referred to as S–16, is allegedly a former drug distribution associate of Stevens. Moroney Aff. ¶ 163. According to S–16, he was primarily involved in drug distribution for Stevens from 1988 until July 1989. *Id.* ¶ 165. Later in 1989, S–16 allegedly began collecting drug debts for Stevens. *Id.* S–16 states that he attended meetings at the Sheraton Makaha Resort where Stevens would divide drugs, including crystal methamphetamine and on one occasion two kilograms of cocaine, among key associates or "lieutenants" of Stevens' organization. *Id.* ¶ 171. S–16 also indicated that in early March 1990 he witnessed Stevens distribute a quantity of crystal methamphetamine to Alfredo "Maki" Corpuz. *Id.* ¶ 176.

Confidential informant S–3 claimed that from July 1987 to March 1988, he dealt in cocaine transactions with Stevens and another individual on a regular basis.[15] Moroney Aff. ¶ 54. More specifically, S–3 recounted three times in July 1988 when Stevens either sold or "fronted" cocaine to S–3. *Id.* ¶¶ 53(d), 54. S–3 turned the cocaine over to the Honolulu Police Department. *Id.*

Another confidential informant, S–13, advised that he sold two ounces of crystal methamphetamine to Stevens for $7,000 in September 1989. Moroney Aff. ¶ 124. After that sale, S–13 indicated that Stevens continuously contacted him to purchase more crystal methamphetamine. *Id.* ¶ 129. S–13 further relayed that his own source, Tae Yong Choe ("Yong"),[16] warned him

---

**13.** Guerrero was one of the largest dealers of crystal methamphetamine in Hawaii. After pleading guilty to a drug conspiracy charge, Guerrero was sentenced to twenty-five years of imprisonment.

**14.** For example, S–2 indicated that on at least one occasion he lent money to Lincoln Caminos to purchase heroin from Stevens. Moroney Aff. ¶ 37. S–2 also stated that Lionel Sequin attempted to sell him an "eightball" of cocaine for $300.00. *Id.* ¶ 41. Furthermore, S–2 advised that he had witnessed Lincoln Caminos making numerous drug sales from his mother's residence. *Id.* ¶ 49. S–2 further related that Stevens went to the Caminos residence approximately every other day. *Id.* ¶ 50. S–2 believed that Stevens was Lincoln Caminos' supplier. *Id.*

**15.** Stevens claims that S–3 is not a reliable source. Stevens Mem. (Wiretap) at 12. Stevens relies on Moroney's statement that S–3's reliability regarding two alleged drug transactions with Stevens could not be fully corroborated because

S–3 was never observed by law enforcement officers leaving the scene of the transactions. Moroney Aff. ¶ 53(d). The court notes, however, that there is no information to suggest that S–3 is unreliable; the aforementioned statement merely asserts that HPD could not corroborate S–3's account. Furthermore, the court notes that Agent Moroney's affidavit provides that S–3 was utilized as a confidential source for both the FBI and HPD from July 1987 until late 1988. *Id.* ¶ 53. HPD indicated that S–3 was reliable and that his information resulted in the initiation of numerous, successful drug cases from October 1987 to February 1988. *Id.* ¶ 53(a). Also as a result of S–3's information, HPD arrested at least seven persons in connection with cocaine and heroin purchases. *Id.* ¶ 53(b).

**16.** On February 16, 1990, Yong and four members of his family were indicted on drug and money laundering charges. *United States v. Tae Yong Choe,* Cr. No. 90–00269 ACK (D.Haw.). Moroney Aff. ¶ 133. In connection with Yong's

that Stevens had approached members of Japanese organized crime, or Yakuza, in Hawaii in order to get a direct supply of crystal methamphetamine for resale. *Id.* ¶ 132. Yong allegedly told S–13 that Stevens was trying to circumvent and compete with Yong's line of crystal methamphetamine. *Id.*

In addition to S–13, confidential informant S–14, who allegedly had a reputation for being able to provide large quantities of crystal methamphetamine, indicated that Stevens contacted him on several occasions seeking to be supplied with crystal methamphetamine. *Id.* ¶¶ 142–46. S–14 also advised that one of Stevens' alleged associates relayed to him that Stevens wanted to purchase $500,000 worth of crystal methamphetamine. *Id.* ¶¶ 147–48.

Agent Moroney provides information concerning the reliability of all of the confidential sources. Two of the confidential informants, S–1 and S–10, are law enforcement officers. Moroney Aff. ¶¶ 29(a), 102. At least three of the sources, S–6, S–8, and S–12, are "good citizen" sources. *Id.* ¶¶ 77, 95, 108. A "good citizen" source is an individual who cooperates with law enforcement agencies, requests confidentiality, and is not known to be involved in criminal activity. *Id.* ¶ 77. Furthermore, three of the sources, S–2, S–14, and S–16, are allegedly former associates of Stevens' purported criminal network. *Id.* ¶¶ 32, 135(g), 163, 163(b).

In support of the reliability of the various confidential sources, the court notes that virtually all of the sources had been supplying the FBI and/or HPD with information for a period of more than one year.[17] Furthermore, many of the informants had previously provided reliable information which led to successful investigations, arrests, searches, and convictions.[18] In addition, with respect to almost all of the informants, none of the information previously supplied had proven to be incorrect.[19]

Based on the foregoing discussion, the court finds that there was probable cause to believe that Stevens and his associates were involved in the distribution of illicit drugs, thereby satisfying the probable cause requirement of 18 U.S.C. § 2518(3)(a). The court notes that § 2518(3) also requires the existence of probable cause to believe that the electronic communications facility which is the subject of the application is being used in connection with the alleged offenses. 18 U.S.C. § 2518(3)(d). In light of the aforementioned evidence regarding Stevens' alleged illegal activity, the court finds that there was probable cause to believe that Stevens' home telephone was being used in connection with such activity. This determination is further supported by the pen register analysis and the fact that several of the confidential informants reported having drug-related conversations with Stevens while Stevens was talking on his home telephone line.[20] Finally, § 2518(3) further

---

arrest, over thirteen pounds of crystal methamphetamine were recovered along with $833,000 in cash. *Id.*

17. For instance, at the time the Moroney affidavit was filed, July 16, 1990, S–4 had been providing information to HPD since February 1987. Moroney Aff. ¶ 55. With the exception of S–5, S–12, and S–16, all of the other confidential informants had been providing information to HPD and/or FBI for a period of more than one year.

18. For example, prior to the execution of the Moroney affidavit, S–2 had provided information to the HPD which resulted in: six arrests; two indictments; and the seizure of over 2.2 pounds of cocaine, drug paraphernalia, a significant amount of cash, two revolvers, and ammunition. Moroney Aff. ¶ 35. Similarly, S–7 provided information to the FBI which led to: four

cases being disseminated to local law enforcement agencies; twenty-eight subjects being located and then identified in other drug-related matters; and two cases having been initiated. *Id.* ¶ 93(d).

19. *See* Moroney Aff. ¶¶ 29(b), 33, 55(c), 62, 73, 93(b), 95(b), 104(b), 113(b), 135(b), 151(b), 163(a).

20. S–13 indicated that during August and September 1989 he and Stevens, speaking from his home telephone, had at least fifteen telephone conversations regarding crystal methamphetamine. Moroney Aff. ¶ 131. Similarly, S–14 advised that in February 1990 Stevens often called S–14's beeper and left messages to call Stevens at his home telephone. *Id.* ¶ 143–45. S–14 related that on several occasions he answered Stevens' message by calling him at his

requires the existence of probable cause to believe that particular communications concerning the subject offenses will be obtained through the requested interception. 18 U.S.C. § 2518(3)(b). The court finds that this probable cause showing was also clearly satisfied.

Stevens contends that Judge Pence did not have a substantial basis for concluding that there was probable cause to believe that Stevens and his alleged associates were involved in a drug distribution scheme. Stevens attempts to undermine the significance of all the information in Agent Moroney's affidavit by attacking the reliability or materiality of each of the informants' statements. The court finds Stevens' analysis to be flawed in two major respects.

First, the Supreme Court has emphasized that probable cause must be evaluated based upon a common sense examination of the "totality of the circumstances." *Massachusetts v. Upton,* 466 U.S. 727, 732, 104 S.Ct. 2085, 2087, 80 L.Ed.2d 721 (1984); *Illinois v. Gates,* 462 U.S. 213, 230–38, 103 S.Ct. 2317, 2328–32, 76 L.Ed.2d 527 (1983). Stevens' attempt to attack each individual piece of evidence as insufficient to support a finding of probable cause ignores the Supreme Court's mandate to consider all the evidence as a whole in a practical manner. Moreover, the court notes that the interlocking nature of the statements of the various informants significantly enhances the credibility of their individual stories. *United States v. Hernandez–Escarsega,* 886 F.2d 1560, 1566 (9th Cir.1989)

("Although the reliability of several of [the] confidential sources was not clearly established, the detailed nature of many of their statements and the interlocking nature of their stories enhanced their credibility."), *cert. denied,* — U.S. —, 110 S.Ct. 3237, 111 L.Ed.2d 748 (1990); *see also United States v. Landis,* 726 F.2d 540, 543 (9th Cir.), *cert. denied,* 467 U.S. 1230, 104 S.Ct. 2688, 81 L.Ed.2d 882 (1984).

Second, the court finds no merit to Stevens' individual objections. Stevens argues that some of the information in Agent Moroney's affidavit is false. The court notes that it has already rejected that argument in the context of the *Franks* hearing analysis. Stevens also contends that some of the information in Agent Moroney's affidavit is stale. The court finds Stevens' argument of staleness unpersuasive in light of the duration and continuity of Stevens' alleged drug activities. *See Hernandez–Escarsega,* 886 F.2d at 1566–67.[21]

Stevens attacks the personal knowledge of several of the informants, however, the court notes that the majority of the informants related accounts of direct observation of, or contact with, Stevens or his alleged associates. With respect to Stevens' credibility challenges, the court notes that while some of the informants are presumably more reliable than others, almost all of the informants had been providing confidential information to law enforcement personnel for an extended period of time. The court similarly finds little merit to Stevens' claims of lack of corroboration.[22]

home telephone number. *Id.* ¶ 146. Several of these conversations allegedly related to the purchase of crystal methamphetamine. *Id.*

**21.** In *Hernandez–Escarsega,* most of the information in the affidavit accompanying the search warrant at issue was several years old and the most recent evidence related to events of nearly a year prior to the warrant. 886 F.2d at 1566. Nonetheless, the court held that the information in the fifty-two page affidavit was not stale in light of the substantial evidence detailing the defendant's numerous instances of his involvement with drugs throughout the prior decade. *Id.* The Ninth Circuit explained:

The affidavit thus tended to establish the existence of a widespread, firmly entrenched, and

ongoing narcotics operation in which [the defendant] played a pivotal role. In such circumstances, staleness arguments lose much of their force.

*Id.*

**22.** The court notes that even if the Wiretap Order was issued upon insufficient probable cause, this court would not suppress the subject intercepted communications in light of the good faith exception established in *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). In that case, the Supreme Court held that the Fourth Amendment does not require the suppression of evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant. *Id.* at 922, 104 S.Ct. at 3420. The Eleventh Circuit has recog-

### D. Necessity

■ In addition to the probable cause prerequisites, § 2518 of Title III requires the applicant to show that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c). This condition is commonly referred to as the "necessity" requirement. *United States v. Brown*, 761 F.2d 1272, 1275 (9th Cir.1985).

■ The Ninth Circuit has provided the following explanation:

The necessity requirement exists "to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." Although wiretaps are not to be used routinely "as the initial step in criminal investigation[s], the necessity requirement is not intended to relegate the use of wiretaps to that of last resort; the restriction must be interpreted "in a practical and commonsense fashion."

*Brown*, 761 F.2d at 1275 (citations omitted). The conclusion of the issuing judge that the affidavit accompanying the application for a wiretap order satisfied the necessity requirement is reviewed only for an abuse of discretion.[23] *United States v. Homick*, 964 F.2d 899, 903 (9th Cir.1992).

The Ninth Circuit has cautioned that a court should not invalidate a wiretap order merely because a defendant is able to offer some alternative investigative method which could have been used by the investigating law enforcement agency. *United States v. Carneiro*, 861 F.2d 1171, 1178 (9th Cir.1988). In *Carneiro*, the defendants argued that the Drug Enforcement Administration ("DEA") had failed to satisfy the Title III necessity requirement. The defendants attempted to show several investigative methods which the DEA could have pursued in investigating their alleged criminal activities prior to seeking a wiretap order. Rejecting the defendants' contentions, the Ninth Circuit reasoned:

They merely suggest, with the benefit of hindsight, alternative ways that the DEA could have pursued its investigation. The investigative methods used by the DEA were potentially productive. The fact that the DEA could have taken different or some additional steps in its investigation does not demonstrate that the district court abused its discretion in upholding the wiretap order.

*Id.* at 1178.[24] *See also Homick*, 964 F.2d at 903 (the federal wiretap statute does not require the government to exhaust every conceivable alternative before obtaining a wiretap).

In the present case, Judge Pence determined: "It has been adequately demonstrated that normal investigative procedures have been tried without success, rea-

---

nized that the *Leon* good faith exception similarly applies to wiretap affidavits. *United States v. Malekzadeh*, 855 F.2d 1492, 1497 (11th Cir. 1988), *cert. denied*, 489 U.S. 1024, 1029, 109 S.Ct. 1149, 1163, 103 L.Ed.2d 209, 221 (1989). In the present case, because of the absence of any deliberately or recklessly false information, the court finds that the FBI monitoring agents relied on the Wiretap Order in an objectively reasonable manner. Additionally, the court notes that the good faith exception would similarly apply if the necessity requirement was not fulfilled or the Wiretap Order was overbroad.

**23.** The court notes that several circuits other than the Ninth Circuit have concluded that the government's burden of establishing compliance with the necessity requirement is "not great." *See, e.g. United States v. Zambrana*, 841 F.2d 1320, 1329 (7th Cir.1988); *United States v. Armocida*, 515 F.2d 29, 38 (3d Cir.), *cert. denied*, 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975).

**24.** In support of its reasoning regarding the necessity requirement, the Ninth Circuit relied on the following cases: *United States v. Brown*, 761 F.2d 1272, 1275 (9th Cir.1985) (the necessity requirement is not intended to limit the use of a wiretap to a last resort investigative tool); *United States v. Webster*, 734 F.2d 1048, 1055 (5th Cir.) (courts will not invalidate a wiretap order because defense lawyers are able to suggest *post factum* some investigative technique that might have been used and was not), *cert. denied*, 469 U.S. 1073, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984); *United States v. Spagnuolo*, 549 F.2d 705, 710 (9th Cir.1977) (the necessity requirement does not require law enforcement officers to exhaust all possible uses of ordinary investigative techniques); *United States v. Pezzino*, 535 F.2d 483, 484 (9th Cir.) (per curiam) (the necessity requirement can be satisfied even though the police failed to use one type of normal investigative technique), *cert. denied*, 429 U.S. 839, 97 S.Ct. 111, 50 L.Ed.2d 106 (1976).

sonably appear unlikely to succeed if continued, reasonably appear unlikely to succeed if tried, or are too dangerous to employ." Wiretap Order ¶ 3. Upon careful review of Agent Moroney's affidavit, the court finds that the government has satisfied the necessity requirement.

In his affidavit, Agent Moroney elaborated on the reasons why normal investigative procedures were no longer reasonable. Moroney Aff. at 76–82. Agent Moroney explained that while the confidential informants had provided a considerable amount of information, they were not able to describe the full nature of Stevens' involvement in the distribution of controlled substances in Hawaii nor were they able to identify all the members of his alleged distribution organization. *Id.* ¶ 241(a). Of even greater significance, the confidential informants provided very little information concerning Stevens' alleged drug suppliers. *Id.*

Agent Moroney stated that the use of undercover agents had not been attempted. Moroney Aff. ¶ 241(b). However, Agent Moroney explained why the use of confidential informants would likely be unsuccessful:

> It is believed that the use of an undercover agent would fail because of the social, ethnic and organizational barriers which make it extremely difficult for unproven individuals who are not life-long residents of the Waianae area on Oahu to secure the trust and confidence of members of the Stevens' organization. These barriers include life-long associations and friendships between many of the organizational members, their geographical proximity to one another in the Waianae district at the western end of Oahu, their generally "local" racial and ethnic backgrounds which does not include northern european caucasian; and their general use of Hawaiian Creole English, otherwise known as "pidgin."

*Id.* Additionally, and of significance, Agent Moroney concluded that the use of undercover agents would be particularly dangerous in light of the propensity for violence, including murder, allegedly attributable to Stevens and his alleged associates. *Id.*

Agent Moroney further indicated that physical surveillance was not a reasonable alternative. Moroney Aff. ¶ 241(c). According to Agent Moroney, as well as other FBI agents and several experienced HPD officers familiar with the Waianae region, attempted physical surveillance of Stevens and his alleged associates would result in a high probability of being spotted by Stevens' group. *Id.* ¶ 241(c)(i), (ii). Again, Agent Moroney pointed to the close-knit nature of the Waianae community. Agent Moroney also stated that Stevens employs various counter-surveillance tactics in order to frustrate law enforcement surveillance efforts.[25] *Id.* ¶ 241(c)(ii)–(v).

In his affidavit, Agent Moroney also explained why other types of investigative techniques were not reasonable alternatives under the circumstances. Agent Moroney stated that the pen registers, while helpful, cannot provide the nature of the conversation or the identity of the people conversing. Moroney Aff. ¶ 241(d). Agent Moroney indicated that search warrants were unlikely to produce evidence sufficient to show the full extent of the suspected criminal activity or the identity of all the participants. *Id.* ¶ 241(e). Agent Moroney further advised that use of search warrants, as well as grand jury subpoenas and interviews, would alert Stevens and his alleged associates to the existence of the government's investigation, thereby likely resulting in the destruction of important evidence. *Id.* ¶ 241(e)–(f).

Stevens asserts that the wiretap was not necessary because the government already knew about Stevens' sources, distributors, and disposition of profits.[26] Stevens Sup-

---

**25.** Agent Moroney noted that both S–11 and S–16 told about certain countersurveillance measures taken by Stevens and his associates. Moroney Aff. ¶ 242(c)(iv)–(v).

**26.** The court notes that the dual requirements of probable cause and necessity can place the government in a difficult position. If the government has a small amount of evidence of criminal activity, then it may not satisfy the probable

plemental Mem. (Wiretap) at 3–9, 16–24. With respect to drug sources, Stevens contends that, according to the reports of the confidential informants in Agent Moroney's affidavit, Stevens was getting crystal methamphetamine from S–13, Tommy Titsworth, Mervyn Chan, and possibly George Kukila. *Id.* at 5. Thus, Stevens contends that the necessity requirement was not fulfilled because the government had already identified all of Stevens' drug sources. The court finds no merit to this argument.

First, there is no indication in Agent Moroney's affidavit that S–13 ever distributed crystal methamphetamine to Stevens other than the sale of two ounces in September 1989. Moroney Aff. ¶¶ 114, 124. Second, according to the government, Tommy Titsworth ceased to be a potential significant supplier of crystal methamphetamine to the Stevens organization after Titsworth's arrest in March 1990, several months prior to the wiretap application. Gov't Reply Mem. at 4–5 (citing Moroney Aff. ¶ 185). Furthermore, there is no indication that Stevens ever received crystal methamphetamine directly from Titsworth. Moroney Aff. ¶ 185. Third, Mervyn Chang died in December 1989. *Id.* ¶ 65. Fourth, Agent Moroney's affidavit states that according to S–16 George "Fluff" Kukila was making "kickbacks" to Stevens; the affidavit does not indicate that Kukila was actually supplying Stevens with crystal methamphetamine. *Id.* ¶ 177. In sum, the information in Agent Moroney's affidavit did not clearly identify Stevens' current suppliers of crystal methamphetamine and in fact indicates the government's inability to fully identify those sources.

Similarly, Stevens exaggerates the extent of the government's information regarding his alleged drug distributors. Stevens Supplemental Mem. (Wiretap) at 5–9, 22. Whereas Agent Moroney's affidavit has numerous accounts from the confidential sources regarding members of Stevens' alleged crystal methamphetamine distribution ring, the majority of this information was hearsay evidence which would not be admissible at trial. Only a few of the informants actually reported purchases of crystal methamphetamine from alleged associates of Stevens. *See, e.g.* Moroney Aff. ¶ 104(c) (S–11); ¶ 112 (S–12). Thus, while the government had reliable intelligence information regarding the criminal activities of Stevens and his purported associates, the government had not generated a prosecutable case at the time of the wiretap application.

With respect to disposition of drug-related income, S–2 and S–4 related that Stevens laundered his drug money by investing two to three million dollars in the Medeiros Trucking Company. Moroney Aff. ¶¶ 51, 59. Furthermore, S–16 advised that Stevens " 'washes' his drug money through hidden interests in legitimate businesses, but never under his own name." *Id.* ¶ 166. Again, while this information is significant, it does not provide a thorough look at Stevens' disposition of drug profits.

The court notes that the present case is similar to *United States v. Commito,* 918 F.2d 95 (9th Cir.1990), *cert. denied,* — U.S. ——, 112 S.Ct. 224, 116 L.Ed.2d 181 (1991). In that case, the district court granted the defendant's motion to suppress on the basis that the FBI's affidavit accompanying the application for a wiretap order did not satisfy the necessity requirement of 18 U.S.C. § 2518. Reversing the district court, the Ninth Circuit noted that "[t]he judge who suppressed the evidence after a detailed critique of the affidavit of defense counsel held the government to a standard that would allow virtually no wiretaps in

cause requirement. On the other hand, if the government has a large amount of evidence, then it may not satisfy the necessity requirement. Clearly there must be a considerable amount of latitude between these two extremes in order to allow the government to effectively investigate criminal matters.

In the present case, the government has made a very strong showing of probable cause. Therefore, Stevens apparently attempts to use the strong showing of probable cause against the government by arguing that the government already had so much evidence against Stevens that the wiretap was unnecessary. Although Stevens' necessity argument has some visceral appeal, it does not withstand legal scrutiny under the deferential standards pertaining to the necessity requirement.

the investigation of organized crime." *Id.* at 99.

Moreover, the Ninth Circuit in *Commito* rejected the notion that the government already had sufficient evidence against the defendant and that the wiretap was therefore unnecessary. The court explained:

> Although the traditional investigative measures used by the government provided evidence sufficient to confirm the FBI's suspicions that Commito and certain of his associates were engaged in racketeering schemes, they failed to produce evidence sufficient to bring federal indictments against these men. After nearly a year of relying on these measures, the FBI did not know significant features of the enterprise, including the precise means by which Commito and his men concealed the illegal kickbacks, the identities of Commito's many associates, and the nature of other schemes similar to the one planned with the undercover agent.

*Id.* at 98.

Stevens further contends that the FBI presented false allegations to Judge Pence regarding the likelihood of success of normal investigative procedures, namely the effectiveness of search warrants. Stevens Supplemental Mem. (Wiretap) at 10–12, 18–20. The court notes that it has already determined, in the context of evaluating whether a *Franks* evidentiary hearing was required, that the FBI did not knowingly make false representations to Judge Pence regarding the effectiveness of search warrants.

 Finally, Stevens argues that the FBI could have, but did not, have confidential source S–14 pursue a pre-existing relationship with Stevens. Stevens Supplemental Mem. (Wiretap) at 12, 22–24. According to Agent Moroney's affidavit, S–14 was a longtime close associate of Stevens and had participated in numerous criminal acts with Stevens in the past. Moroney Aff. ¶ 135(g). S–14 indicated that he met Stevens in September 1989 and that Stevens gave him his home telephone number for future meetings. *Id.* ¶ 139.

In February 1990, S–14 "put the word out" that he had the ability to provide large quantities of crystal methamphetamine. *Id.* ¶ 142. As a result, S–14 purportedly received calls from a large number of individuals, including Stevens, inquiring about his ability to supply crystal methamphetamine. *Id.* ¶ 142. During the middle of February, S–14 had at least four telephone conversations with Stevens, of which at least two calls involved requests by Stevens for crystal methamphetamine. *Id.* ¶ 146.

According to the government, S–14 never consummated any drug deals with Stevens. Gov't Reply Mem. at 9. Additionally, there is no information in Agent Moroney's affidavit which would indicate that S–14 had any contact with Stevens subsequent to February 1990. In fact, it appears that S–14 may have been incarcerated at the time of the wiretap application. Moroney Aff. ¶ 135(f).

 The court finds that the FBI's failure to attempt to further pursue S–14's relationship to Stevens does not demonstrate that the issuing judge abused his discretion in determining that the government had satisfied its burden of proving necessity. As indicated above, a court should not invalidate a wiretap order merely because a defendant is able to suggest, with the benefit of hindsight, some alternative investigative method which could have been used. *United States v. Carneiro,* 861 F.2d 1171, 1178 (9th Cir.1988) (rejecting defendant's argument that the Drug Enforcement Agency did not satisfy the necessity requirement because it, among other things, did not aggressively pursue interviews with persons associated with defendant's drug ring).

While Stevens relies on *United States v. Simpson,* 813 F.2d 1462 (9th Cir.), *cert. denied,* 484 U.S. 898, 108 S.Ct. 233, 98 L.Ed.2d 192 (1987), the court finds that case to be distinguishable from the instant case. In *Simpson,* the district court suppressed evidence obtained through a wiretap because the FBI had misrepresented the role of a key informant in the affidavit supporting the wiretap application. *Id.* at

1471–73. The court found that while the affidavit portrayed the informant as an "innocent, uninvolved eavesdropper" to the defendant's activities, the informant was actually deeply involved with the defendant. *Id.* at 1471.

On appeal, the government argued that the evidence should not be suppressed because the FBI's misrepresentations were not material to the issuing judge's finding of necessity. *Id.* at 1472. Holding that the misrepresentations were material, the Ninth Circuit noted that the informant at issue had established a very close relationship, including sexual involvement over several months, with the defendant. *Id.* at 1465, 1472. Furthermore, the informant had been present on several occasions when the defendant had conducted business with other members of the alleged drug ring. *Id.* at 1472. Finally, the informant had become trusted enough to be permitted to identify potential drug purchasers for the defendant. *Id.* Within two months of meeting the defendant, the informant had twice arranged for him to sell heroin to undercover agents and had also introduced him to another undercover agent. *Id.* at 1471–72.

In comparison, the court finds that the documented relationship between S–14 and Stevens does not approach the level of involvement of the informant and the defendant in *Simpson.* To the contrary, the court finds the present case to be similar to the facts of *United States v. Commito,* 918 F.2d 95 (9th Cir.1990).

In *Commito,* a labor racketeering case, the undercover FBI agent won the defendant's confidence sufficient to receive an illegal kickback offer from the defendant in consideration for his business. *Id.* at 97. The defendant "invited the undercover agent to several meetings regarding other deals, solicited the agent's business, encouraged him to become further involved in his enterprise, and put him in touch with other business associates." *Id.* at 98. Nonetheless, at the end of ten months of undercover work, the agent had only limited knowledge regarding the details of the defendant's criminal network. *Id.* Accord-

ingly, the Ninth Circuit held that the "government was not obligated to continue this relatively unproductive undercover state of affairs in the hope of gaining [the defendant's] complete trust." *Id.*

In light of the information provided in Agent Moroney's affidavit regarding the likelihood of success of normal investigative procedures, the court finds that Judge Pence did not abuse his discretion in determining that the government had satisfied the necessity requirement.

### E. *Overbreadth*

■ Stevens argues that the Wiretap Order was overly broad. Stevens Mem. (Wiretap) at 26–27. Pursuant to 18 U.S.C. § 2518(4)(c), a wiretap order must specify "a particular description of the type of communication sought to be intercepted, and a statement of the particular offense to which it relates." Such order must also indicate "the period of time during which such interception is authorized." 18 U.S.C. § 2518(4)(e). Moreover, the wiretap order must terminate upon attainment of the authorized objection or within thirty days, whichever is earlier. 18 U.S.C. § 2518(5).

As the Wiretap Order in this case directly tracked the aforementioned statutory language from Title III, the court finds no merit to Stevens' overbreadth argument. *See generally United States v. Carneiro,* 861 F.2d 1171, 1178–80 (9th Cir.1988) (discussing overbreadth challenges to wiretap orders). The court also notes that Stevens has provided absolutely no evidence which would indicate that the government employed the subject wiretaps for any longer than was necessary. In contrast, the government has supplied credible evidence that the wiretap lasted no longer than was justified.

### F. *Minimization*

■ Title III requires the government to conduct wire intercepts in a manner "to minimize the interception of communications not otherwise subject to interception" under Title III. 18 U.S.C. § 2518(5). The Ninth Circuit has elaborated upon the minimization requirement:

Minimization requires that the government adopt reasonable measures to reduce the interception of conversations unrelated to the criminal activity under investigation to a practical minimum while permitting the government to pursue legitimate investigation. The standard for minimization is reasonableness.... The mere interception of calls unrelated to the [alleged criminal activity] does not indicate a failure to meet the minimization requirement.

*United States v. Torres,* 908 F.2d 1417, 1423–24 (9th Cir.) (citations omitted), *cert. denied,* —— U.S. ——, ——, 111 S.Ct. 272, 366, 112 L.Ed.2d 228, 329 (1990). The government has the burden of proving proper minimization. 908 F.2d at 1423.

In *Torres,* a case very similar to the present case, the Ninth Circuit rejected the defendants' contention that the Drug Enforcement Administration ("DEA") failed to minimize its monitoring of phone calls from the home telephone of one of the defendants, a suspected drug dealer. 908 F.2d at 1423–24. The court noted: "Because the record does not indicate that the DEA intercepted a 'clear pattern of any substantial number of innocent calls,' we find the interception was properly minimized." *Id.* at 1423 (citation omitted).

The Ninth Circuit in *Torres* also found that the DEA had adopted reasonable procedures to ensure minimization. 908 F.2d at 1423. Of particular relevance to the instant case, the court further noted:

Where the intercepted phone line is located in the residence of the head of the drug distribution conspiracy, monitoring agents may intercept a broader range of calls.... Where, as here, the wire intercept concerns a drug ring, the need to allow latitude to monitoring agents is paramount. A conversation between principals that begins innocuously may become drug-related. The fact that the

FBI overheard a few innocent conversations does not render its minimization efforts unreasonable.

*Id.* at 1424 (citations omitted).

In *Torres,* the Ninth Circuit relied in part on the Supreme Court's reasoning in *Scott v. United States,* 436 U.S. 128, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978). In that case, government agents, investigating a narcotics distribution conspiracy, intercepted via wiretap all of the calls made to or from one of the defendants' home telephones. *Id.* at 139, 98 S.Ct. at 1724. Apparently the agents did not utilize any minimization techniques. The Supreme Court held that the government's lack of minimization was not unreasonable under the particular circumstances. *Id.* at 141, 98 S.Ct. at 1725. The Court explained that investigation of a wide-spread conspiracy justifies more extensive surveillance. *Id.* at 140, 98 S.Ct. at 1724. The Court further reasoned that in a case "involving a wide-ranging conspiracy with a large number of participants, even a seasoned listener would have been hard pressed to determine with any precision the relevancy of many of the calls before they were completed." *Id.* at 142, 98 S.Ct. at 1725.

Turning to the present case, the court finds that the FBI properly minimized intercepted conversations. FBI monitoring agents were initially briefed on minimization procedures and then required to read a seventeen-page set of instructions on conducting the electronic surveillance at issue.[27] *See* Instructions for Conducting Electronic Surveillance ("Wiretap Instructions") (Gov't Ex. 4). The agents were instructed that their "job was to listen to/record all *pertinent* conversations, while minimizing the interception of innocent (non-criminal) conversations." *Id.* ¶ 23.

**27.** In order to insure ongoing judicial supervision of the FBI's electronic surveillance practices, the Wiretap Order required the United States Attorney's office to submit a report to the court every seven days explaining the current status of the wiretap operation. Wiretap Order at 8; *see also United States v. Angiulo,* 847 F.2d 956, 979–80 (1st Cir.) (weekly progress reports en-

sured compliance with Title III minimization requirements), *cert. denied,* 488 U.S. 852, 928, 109 S.Ct. 138, 314, 102 L.Ed.2d 110, 332 (1988). At the suppression hearing, the government indicated that it had provided a copy of the minimization instructions to Judge Pence in its initial seven-day report concerning the wiretap results.

The instructions provided that the agents "should listen to the beginning of each conversation only so long as is necessary to determine the nature of the conversation and, in any case, no longer than a few minutes unless the conversation is pertinent, that is, the conversation is within the scope of our authorization...." Wiretap Instructions ¶ 25. *Accord United States v. Homick,* 964 F.2d 899, 903 (9th Cir.1992) (Title III not violated where agents routinely listened to the first two minutes of every conversation). With respect to non-criminal conversations, the agents were instructed to "spot monitor," i.e. periodically listen to brief portions of the conversation to ensure that the innocent conversation has not turned to criminal matters. Wiretap Instructions ¶¶ 27–31. *Accord United States v. Angiulo,* 847 F.2d 956, 978–80 (1st Cir.) (thoroughly rejecting defendant's objection to spot monitoring), *cert. denied,* 488 U.S. 852, 928, 109 S.Ct. 138, 314, 102 L.Ed.2d 110, 332 (1988).

Stevens raises several specific objections to the FBI's minimization procedures. First, he contends that many of the conversations are in "pidgin" and are very difficult to understand. Stevens Mem. (Wiretap) at 25. The court fails to see how this contention is relevant to the issue of whether the government properly minimized its monitoring.

Second, Stevens argues that the FBI intercepted innocent conversations after a pattern of innocent calls developed. Stevens Supplemental Mem. (Wiretap) at 27–28. In particular, Stevens objects to the monitoring of phone calls involving his great grandmother-in-law, Elmira Orso ("Mrs. Orso"), and his then four-year old daughter Charlesee Stevens. *Id.* While Stevens does not seem to allege that the FBI failed to properly minimize these calls, he apparently argues that the FBI should not have monitored any portion of these calls. *Id.* With respect to Charlesee Stevens, the court is unaware of any telephone calls which were initiated by her or any

calls in which she was a significant participant. *See* Second Decl. of FBI Special Agent Daniel P. Kelley ¶ 12 (attached to Gov't Reply Mem.).

With respect to Mrs. Orso, the government contends that some of her calls were pertinent to the investigation. Gov't Reply Mem. at 27. The government indicates that while most members of the Stevens family spoke in coded language when discussing criminal matters over the phone, Mrs. Orso was forthright and outspoken. *Id.* More importantly, the government points to specific conversations in which Mrs. Orso makes reference to family members' use of crystal methamphetamine as well as the April 3, 1988 murder of Lorenzo Young which she indicated was done by Sharn Stevens' ex-boyfriend, Wallace "Didi" Rodriguez. *Id.* (relying on transcripts of Calls 929 and 2375, attached to Gov't Reply Mem.). Accordingly, the court finds that it was not unreasonable for the FBI to intercept calls involving Mrs. Orso.

Third, Stevens contends that his wife, codefendant Aletha None Joseph, was named in the Wiretap Order without probable cause.[28] Stevens Supplemental Mem. (Wiretap) at 28–29. The court notes, however, that this argument has been rejected by the Ninth Circuit. *United States v. Martin,* 599 F.2d 880, 884–85 (9th Cir.), *cert. denied,* 441 U.S. 962, 99 S.Ct. 2407, 2408, 60 L.Ed.2d 1067 (1979). In that case, the Ninth Circuit held that neither the Fourth Amendment nor Title III requires the existence of probable cause as to every person named in a wiretap application. *Id.* In the present case, as probable cause existed with respect to Stevens, the government did not need to demonstrate probable cause regarding Joseph.

Fourth, Stevens contends that the government monitored conversations between his wife, codefendant Aletha None Joseph, and himself in violation of the marital communication privilege. Stevens

---

**28.** The court notes that Stevens probably lacks standing to raise this argument. *See Alderman v. United States,* 394 U.S. 165, 171–74, 89 S.Ct. 961, 965–67, 22 L.Ed.2d 176 (1969). Nevertheless, as Joseph certainly would have standing if she adopted the argument, the court will address the issue.

Mem. (Wiretap) at 26; Stevens Supplemental Mem. (Wiretap) at 13, 29. With respect to the marital privilege, the agents were instructed:

> Any conversation between a husband and wife which relates in any way to the marital relationship is privileged. You are to discontinue monitoring if you discover that you are intercepting a *personal* conversation solely between husband and wife.... However, it may be that a target's wife or husband acts as a partner, message-taker or message-deliverer for a member of the conspiracy.... Thus, if the conversation does *not* deal with private matters between husband and wife, but instead with ongoing ... violations of law, it is not a privileged communication.

Instructions ¶¶ 16–17. Stevens has presented no evidence that the monitoring agents acted contrary to the Wiretap Instructions regarding the marital privilege.

Accordingly, as there is significant evidence that Joseph was an active member of Stevens' alleged drug conspiracy, the court finds no merit to Stevens' marital communications privilege claim. The Ninth Circuit has squarely held that the privilege does not apply to communications regarding present or future crimes in which both spouses are involved. *United States v. Marashi*, 913 F.2d 724, 730 (9th Cir.1990).

Fifth, Stevens argues that the FBI failed to properly minimize the interception of innocent phone calls. Stevens Supplemental Mem. (Wiretap) at 13–16, 30. In particular, Stevens relies on eight calls which were allegedly innocent calls which were not minimized properly. *Id.* at 15–16. However, as the government explains in its reply memorandum, these calls were in fact monitored in accordance with the approved minimization procedures. Gov't Reply Mem. at 20–26.

With respect to seven of the eight challenged calls, Stevens' interpretation of the FBI's minimization of the call was contradicted by the actual electronic surveillance log sheets which the monitoring agents

filled out for every call. *Id.* (Call Nos. 2426, 3406, 3500, 5390, 5391, 5473, 9978). The other call, while not pertinent when viewed in isolation, was not minimized due to the context of the call in relation to other calls; the call at issue was preceded by numerous calls on that same date between the same parties in which drug-related activity was discussed. *Id.* at 21–23 (Call No. 2833).[29]

■ Additionally, at the suppression hearing, Stevens introduced into evidence a table containing a summary of approximately 389 calls which he contends were improperly minimized. Stevens Ex. 1. The table was prepared by Anette Aiwohi ("Aiwohi"), a paralegal working for Stevens' attorney. There is no evidence that Aiwohi has had any prior experience with wiretap investigations or has had any training which would qualify her to examine wiretap results. Aiwohi conceded that she had no experience in law enforcement or criminal investigation. Accordingly, while the court admitted the table into evidence, the court notes the questionable credibility of the table in light of Aiwohi's complete lack of expertise in the area of criminal wiretap investigations.

According to Aiwohi, all of the calls listed in the table were non-pertinent calls which exceeded two minutes and were improperly minimized after the initial two minutes. Upon cross examination, Aiwohi admitted that some of the calls described above involved conversations which were innocent at the start of the call but turned to criminal matters later in the call. Aiwohi further admitted that she did not seek to ascertain whether calls which, when examined in isolation might seem non-pertinent, were in fact relevant to the investigation when viewed in light of other calls immediately surrounding the call at issue.

After cross examination of Aiwohi revealed that a significant number of the allegedly improperly minimized calls had apparently been minimized in accordance with the government's minimization in-

---

**29.** The court notes that Stevens has not disputed any of the government's explanations regarding the eight calls which he specifically challenged in his supplemental memorandum.

structions, Stevens produced a list of approximately 194 calls which were allegedly not monitored in accordance with the instructions. Stevens Ex. 3. Subsequent to the hearing, the government submitted a memorandum regarding the monitoring of the allegedly improperly minimized calls. Using a random sampling of twenty percent of the 194 calls, the government demonstrated that the vast majority of the calls analyzed had actually been properly minimized. Furthermore, the few calls which had been improperly minimized typically involved insubstantial amounts of excess monitoring.

Having carefully and thoroughly reviewed all of Stevens' general and specific objections to the FBI's minimization techniques, the government's responses, and the electronic surveillance log sheets at issue, the court finds that the FBI's minimization efforts were reasonable under the circumstances of this case. *See generally Scott v. United States,* 436 U.S. 128, 139–43, 98 S.Ct. 1717, 1724–26, 56 L.Ed.2d 168 (1978); *United States v. Torres,* 908 F.2d 1417, 1423–24 (9th Cir.1990); *United States v. Wilson,* 835 F.2d 1440, 1445–46 (D.C.Cir. 1987).[30]

Moreover, the FBI's monitoring procedures were in accordance with previously-established judicial parameters. *United States v. Homick,* 964 F.2d 899, 903 (9th Cir.1992) (Title III not violated where agents routinely listened to the first two minutes of each conversation) *United States v. Angiulo,* 847 F.2d 956, 978–80 (1st Cir.) (upholding government's spot monitoring practice of randomly turning the recording equipment on for two minutes and then off for one minute), *cert. denied,* 488 U.S. 852, 928, 109 S.Ct. 138, 314, 102 L.Ed.2d 110, 332 (1988). Further-

more, even if a few of the more than thirteen thousand intercepted phone calls were inadvertently minimized improperly, the court need not invalidate the entire results of the wiretap. *United States v. Torres,* 908 F.2d 1417, 1423–24 (9th Cir.), *cert. denied,* —— U.S. ——, ——, 111 S.Ct. 272, 366, 112 L.Ed.2d 228, 329 (1990).[31]

Finally, in his memorandum accompanying his joinder in Stevens' motion to suppress the intercepted communications, defendant John G. Cambra objects to a specific telephone call between Stevens and himself which occurred in the morning of September 19, 1990. In that conversation, Stevens and Cambra talked about auto-mechanics for a significant amount of time before starting to discuss a potential purchase of crystal methamphetamine. The telephone call lasted for thirty minutes and thirty-nine seconds. Cambra contends that the FBI agents monitored the entire conversation and failed to minimize in light of the non-criminal nature of the phone call. Cambra Mem. at 4.

The court finds that Cambra's assessment of the monitoring of the subject call is incorrect. As explained by the monitoring agent, FBI Special Agent Daniel Kelly ("Agent Kelly"), shortly after the conversation began Cambra mentioned the word "pohaku." Gov't Ex. 15, at 1. According to the government, pohaku is the Hawaiian word for rock and is also a term which Stevens and his alleged associates use in reference to crystal methamphetamine. Gov't Mem. (Wiretap) at 51. Attesting to the significance and the drug-related nature of the word pohaku, Agent Kelly described the reference to pohaku in his written summary of the conversation. Gov't Ex. 14. Thus, from the very beginning of

---

**30.** In *Wilson,* the court commented:

The fact that the monitored conversations often started with discussion of non-criminal matters did not require the government to plug its ears. . . . Obviously a blanket rule that the agents must always turn off after X minutes of innocent conversation would create a privileged sanctuary for illegal conversations.
835 F.2d at 1445–1446.

**31.** Additionally, the court notes that Stevens makes an unsupported assertion that the extensions of the wiretap order were unnecessary. Stevens Supplemental Mem. (Wiretap) at 30. However, Stevens does not provide any specific reasons why the extensions were allegedly improper. Having reviewed the applications and accompanying affidavits for the wiretap extensions, the court finds that the supporting affidavits satisfied the necessity requirements for the extensions for the same reasons listed above.

the call, Agent Kelly had reason to suspect that the telephone call would involve crystal methamphetamine.

Moreover, Agent Kelly engaged in significant minimization throughout the subject phone call. He stopped listening, in order to minimize, at eight different points in the discussion. Gov't Mem. (Wiretap) at 52. According to the government, Agent Kelly stopped listening for a total of sixteen minutes and thirty-seven seconds which accounted for more than fifty percent of the conversation. *Id.* This assertion is confirmed by Agent Kelly's electronic surveillance log sheet pertaining to the telephone call at issue. Gov't Ex. 14. Accordingly, the court rejects the defendants' minimization objections.

## II. SEARCHES, SEIZURES, AND ARRESTS

### A. *Search of Stevens on March 22, 1990*

■ On March 22, 1990, the government contends that several HPD officers were conducting physical surveillance of an Ewa Beach residence for the purpose of locating a robbery suspect. After observing a grey-colored Lincoln Continental with heavily tinted windows depart from the residence, the officers followed the vehicle. According to the government, the suspect car was accelerating, screeching its tires, changing lanes in traffic at a high rate of speed, and generally driving in a reckless manner. The government further contends that the subject vehicle was clocked at seventy miles per hour in a forty-five mile per hour zone and that the vehicle had an expired tax decal.

The government maintains that the vehicle was pulled over on the basis of the aforementioned conduct. Stevens was ascertained to be the driver while James Caminos ("Caminos"), Alvin Seguin, and Narcissa Lemau were identified as passengers. During the stop, an HPD officer allegedly observed Caminos attempting to stuff a brown leather handbag under the front seat of the car. According to the officer, Caminos appeared nervous and uneasy. The officer allegedly feared that the bag might contain a weapon. When the officer went to retrieve the bag, Caminos allegedly resisted releasing the bag. During the ensuing struggle, the officer purportedly observed a clear plastic bag containing a white crystal substance resembling crystal methamphetamine protruding from a partially opened zippered compartment on the bag. All of the occupants were arrested for promoting dangerous drugs in the third degree and Stevens was also arrested for various traffic violations.

On March 23, 1990, the authorities obtained a search warrant from State District Court Judge Tany S. Hong permitting a search of the car and the leather hand bag. According to the government, the search of the hand bag revealed: two zip-locked bags containing approximately 2.0 grams of crystal methamphetamine; two glass pipes used for smoking crystal methamphetamine; $4,000 in bundles of $1,000; Stevens' wallet containing $2,500 worth of personal checks made out to him; and miscellaneous items of drug paraphernalia. In a statement made to the police, Caminos indicated that the crystal methamphetamine and the two pipes were his while the leather bag and the remaining contents belonged to Stevens.

Stevens contends that he did not violate any traffic laws and that the stop was merely a pretext for an illegal stop and search. After stepping out of the vehicle, Stevens maintains that HPD officers executed an extensive search of the car and the personal belongings of the occupants. Stevens alleges that the leather bag was searched at the scene of the stop without his permission.

The court finds no merit to Stevens' pretext argument. The court finds the HPD officers' explanation regarding Stevens' traffic violations credible. Beyond mere conclusory allegations, Stevens has provided no evidence of a bad faith, pretextual search. Moreover, the Ninth Circuit's recent decision in *United States v. Lillard*, 929 F.2d 500, 502 (9th Cir.1991) is controlling for the present case.

In *Lillard*, police officers were investigating the defendant for possible methamphetamine manufacturing and had him under constant surveillance. *Id.* at 501. While the officers were following the defendant's vehicle, the defendant began speeding and his car skidded around a corner. *Id.* The officers stopped the defendant's vehicle because he was speeding and driving recklessly. *Id.* When one of the officers approached the defendant's vehicle, he recognized a distinct odor associated with methamphetamine manufacturing. *Id.* at 502. The defendant was then arrested. *Id.*

On appeal of his conviction, the defendant argued that the officer's stop of his vehicle for traffic violations was merely a pretext for investigating his methamphetamine activities. *Id.* The Ninth Circuit rejected the defendant's argument. *Id.* The court noted that while the officer who stopped the defendant knew about the defendant's suspected drug manufacturing, the officer testified that he would have stopped him anyway because of his speeding and careless driving. *Id.*

■■■ Having established the validity of the stop in the present case, the court further finds that the search of Stevens' brown leather hand bag was valid. The government contends that the bag was searched on the day after the stop pursuant to a state search warrant. Stevens does not challenge the state search warrant. Thus, under the government's version of the events, the search was clearly constitutional. Stevens argues that the HPD officers searched his bag at the scene of the stop without his consent. Assuming arguendo that Stevens' version of the facts is true, the search is still in accordance with the Fourth Amendment under the Supreme Court's holding in *New York v. Belton*, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981).

In *Belton*, the Supreme Court established the following bright-line rule:

[W]hen a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile.... [T]he police may also examine the contents of any containers found within the passenger compartment....

453 U.S. at 460, 101 S.Ct. at 2864; *see also United States v. Lorenzo*, 867 F.2d 561, 561–62 (9th Cir.1989). Thus, in light of the search warrant which was obtained and the arresting officers' authority to search pursuant to *Belton*, the court denies Stevens' motion to suppress the evidence obtained in the search of his automobile and leather hand bag.

### B. Statement of Stevens on March 28, 1990

■■■ Following his arrest of March 22, 1990, Stevens was taken to the St. Francis Hospital for emergency room treatment of his hand which appeared infected. Although Stevens was under police custody when he was admitted to the hospital, he was released from custody on March 24, 1990.

On March 28, 1990, HPD Detectives Francis Williams ("Detective Williams") and Lambert Ohia ("Detective Ohia") visited Stevens. One of the officers wore a concealed body tape recorder. The officers engaged Stevens in conversation about crystal methamphetamine and its distribution in the Waianae area. Stevens did not know that his conversation was being recorded.

According to the government,

Stevens appeared knowledgeable about the subject as he discussed procedures related to the drug's manufacture, its street price (about $1,000 per gram), and the fact that "local guys" were probably buying the drug in pound amounts. Stevens referred to crystal methamphetamine as "the commodity."

Gov't Mem. (Searches) at 4.

Stevens argues that his statements must be suppressed because he was not given a *Miranda* warning prior to the aforementioned questioning.[32] The government con-

---

**32.** At the suppression hearing, Stevens also ar-

gued for the first time that his statements were

tends that a *Miranda* warning was not required because Stevens was not in "custody" at the time of the discussion. Stevens apparently alleges that he was in custody at the time of the questioning.

▓▓▓▓ The judicial requirement that law enforcement officials must advise criminal suspects of their Fifth Amendment rights prior to taking a suspect's statement only applies to situations involving custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 477–78, 86 S.Ct. 1602, 1629–30, 16 L.Ed.2d 694 (1966). Thus, the requirements of *Miranda* are inapplicable to situations not involving both "custody" and "interrogation." When determining whether a suspect was in custody, court must consider the totality of the circumstances involved. *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983).

▓▓▓▓ Custody is determined by assessing whether a reasonable person in the suspect's position would believe that he was free to leave. *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984); *United States v. Hudgens*, 798 F.2d 1234, 1236 (9th Cir.1986). A court should consider the following factors in the custody analysis: the language used by the officers in summoning the person interviewed; the physical characteristics of the place where the interrogation occurred; the degree of pressure applied to detain the individual; the duration of the detention; and the extent to which the person was confronted with evidence of his guilt. *Id.* at 1236 (citing *United States v. Booth*, 669 F.2d 1231, 1235 (9th Cir.1981)).

The court finds that under the totality of the circumstances a reasonable person in Stevens' circumstances would have believed that he was free to leave. First, according to the police reports and the tes-timony of Detective Williams at the suppression hearing, it is evident that Stevens had not been in HPD custody for several days. As stated in the two HPD arrest reports relating to Stevens' arrests on March 22, 1990 for traffic violations as well as drug-related offenses, Stevens was "discharged" by HPD Detective Atkinson at 4:00 p.m. on March 24, 1990. *See* Gov't Exs. 2, 3 (introduced into evidence at the suppression hearing). The arrest reports further indicate that Stevens was "released" by Detective Ohia at the same time. *Id.* Detective Williams testified that Detective Ohia informed Stevens at 4:00 p.m. on March 24, 1990 that he was no longer in custody as of that moment.

Second, the recorded statements of Stevens in his conversation with Detective Williams indicate that Stevens was aware of that fact that he had been released from custody. Immediately prior to the pertinent portion of the conversation, Detective Williams discussed with Stevens a possible effort by an unknown person to kill Stevens. Detective Williams inquired whether Stevens wanted a police guard posted outside his hospital room.

In relevant part, the recorded conversation was as follows:

WILLIAMS: ... if you heard that somebody was tryin to whack you, then we would put somebody up here to watch you.... You realize that you've been ... you're pau [Hawaiian word for done or finished] as far as we're concerned?

STEVENS: Mmm hmm.

WILLIAMS: Okay, you been released pending further investigation.

STEVENS: Yeah.

WILLIAMS: I think you understand that huh? Okay. Any idea on how long you gonna be stayin' over here?

involuntary because he may have been under the influence of a pain killer, allegedly Demerol, at the time of the questioning. Initially, the court notes that Stevens concedes that the hospital records are unclear as to whether Stevens was being administered Demerol on March 28, 1990, the date of the questioning. However, even if Stevens was being issued Demerol on that date, Stevens has not provided the court with any specific evidence that he was under the influence of Demerol at the actual time of the questioning. More importantly, the evidence in the record shows that Stevens' statement was entirely knowing and voluntary. The suppression hearing testimony of Detective Williams along with the transcript of his conversation with Stevens indicates that Stevens was alert and acting with full mental capacity.

STEVENS: No, ah ... it'll be another week.

Gov't Ex. K at 3. Additionally, later on in the conversation, Stevens talked about possibly going home earlier than the doctors had originally advised. *Id.* at 5. Stevens also indicated that he had been having plenty of visitors. *Id.*

The court finds that the transcript of the conversation clearly indicates that Stevens knew that he was no longer in custody. Stevens was informed that his room was no longer being guarded; a factor clearly indicating a lack of custody. In the conversation with Detective Williams, Stevens expressly acknowledged that he was free to go. The only reason he was remaining in the hospital was for the ongoing treatment of his hand. Furthermore, Stevens' assertions of considering leaving early and having lots of visitors are incompatible with the notion that he was still in police custody.

As the court finds that Stevens was not in custody at the time of the challenged statements, *Miranda* does not apply. Therefore, the court denies Stevens' motion to suppress his statements of March 28, 1990.

### C. Search of Stevens' Residence on October 5, 1990

On October 4, 1990, Agent Harmon filed an "Application and Affidavit for Search Warrant" seeking permission to search Stevens' residence at 84–049 Lawaia Street, Waianae, Hawaii, as well as a light blue Volkswagen Bug, with State of Hawaii license plate number CSV 236, which was on the premises. *See* Gov't Ex. B. Generally, the application sought permission to search for: controlled substances, including marijuana and crystal methamphetamine; drug paraphernalia; books and records relating to drug trafficking and drug-related income; and firearms and am-

munition. *Id.* Along with the application, Agent Harmon submitted a fifty-two page affidavit. *Id.* On the day the application was made, Judge Pence issued the search warrant requested.[33] *See* Gov't Ex. A.

In his affidavit, Agent Harmon asserted that probable cause existed to believe that a search of Stevens' residence would uncover the specified evidence relating to illegal drug trafficking. His probable cause assertion was based upon: (1) information provided by nine confidential sources and one identified source; (2) arrests of Stevens for firearm and drug offenses on March 22 and August 1, 1990;[34] (3) Stevens' statements of March 28, 1990; and (4) the results of approximately ten weeks of monitoring drug-related conversations through the wiretap on Stevens' home telephone.

With respect to the nine confidential sources and the one identified source, the court notes that all of these informants were previously utilized as sources to support the government's wiretap applications. The sources cited in Agent Harmon's affidavit included: S–2, S–3, S–5, S–9, S–12, S–13, S–14, S–15, S–16, and Paciano "Sonny" Guerrero. Harmon Aff. ¶¶ 8–77. As the information provided by these sources is virtually identical to the recitations made in Agent Moroney's initial affidavit to support the wiretap application, the court need not repeat the litany of information detailing Stevens' alleged drug-related activities.

In addition to the informants and the aforementioned arrests and statements of Stevens, Agent Harmon relied upon the results of the government's wiretap on Stevens' home telephone. Agent Harmon recounted the basic substance of some forty-six drug-related conversations. Harmon Aff. ¶¶ 92(a)–(tt). For example, Agent Harmon indicated that on September 19, 1990, at approximately 8:38 a.m., Stevens and codefendant Cambra had a conversa-

---

**33.** On October 5, 1990, the FBI executed the subject search warrant on the Stevens residence. The search resulted in the seizure of numerous pieces of drug paraphernalia.

**34.** On that date, Stevens, codefendant Glenn "Whitey" Sequin, Jr., and Alvin Sequin were arrested by HPD officers for firearm violations. Following a high-speed chase, the officers recovered: a .380 semi-automatic pistol, a 25–caliber automatic pistol, a glass pipe used to smoke crystal methamphetamine, a small quantity of marijuana, and two police radio scanners.

tion regarding the purchase and resale of a quantity of crystal methamphetamine. *Id.* ¶ 92(pp). Agent Harmon explains:

JACK CAMBRA told CHARLIE STEVENS that CAMBRA had access to "da good shit ... da shit we been waitin fo' fo' fuckin' months." CAMBRA offered to sell STEVENS "da whole ting" for "20,500," explaining to STEVENS since "dey sellin twenty five fo' one gram," STEVENS could resell at "two thousand a gram" for a total of approximately 48,000. CAMBRA told STEVENS that CAMBRA would pick up "one whole one ... some balls" and drive to STEVENS' home. STEVENS instructed CAMBRA, "bring one whole one down wit you den."

*Id.*

In paragraphs ninety-three through one hundred, Agent Harmon describes his general knowledge of the typical practices of drug traffickers. Agent Harmon explains the various types of code words which drug traffickers use to refer to certain drugs and amounts of drugs. Harmon Aff. ¶ 93. Agent Harmon also listed the types of drug-related evidence which is often recovered in a search of the residence of a drug trafficker. *Id.* ¶¶ 94–96, 98, 100. Accordingly, Agent Harmon concluded that a search of Stevens' residence may uncover evidence of drug-related activity, including firearms. *Id.* at 52–52.

Stevens moves to suppress the fruits of the search of October 5, 1990 on the ground that the search warrant was not based upon probable cause.[35] As described in some detail in the discussion relating to the wiretaps, a probable cause determination must be analyzed under a "totality of the circumstances" approach. *Illinois v. Gates*, 462 U.S. 213, 230–38, 103 S.Ct. 2317, 2328–32, 76 L.Ed.2d 527 (1983). The task of a court reviewing a probable cause determination is simply to ensure that the issuing judge or magistrate had a *substantial basis* for concluding that probable cause existed. 462 U.S. at 238, 103 S.Ct. at 2332 (emphasis added). A finding of proba-

ble cause by the issuing judge or magistrate must be upheld unless it is clearly erroneous. *United States v. McQuisten*, 795 F.2d 858, 861 (9th Cir.1986).

Relying on the same arguments as he presented with respect to the wiretaps, Stevens contends that the information provided by the numerous informants is unreliable. Stevens also argues that the forty-six recorded conversations were not a proper basis for probable cause because the wiretap was illegal. The court notes that it has already thoroughly considered and rejected these arguments in the wiretap portion of this order. The court has also rejected Stevens' argument regarding the legality of his arrest on March 22, 1990 and his statements of March 28, 1990.

Finally, Stevens argues that Agent Harmon's affidavit was inconsistent with Agent Moroney's affidavits supporting the wiretap applications. Again this court rejected this argument in the discussion relating to the *Franks* hearing issue. Accordingly, the court finds that probable cause did exist with respect to the search warrant issued on October 4, 1990. Thus, the court denies Stevens' motion to suppress the fruits of the search of October 5, 1990.

### D. *Search of Padilla's Residence on October 23, 1990*

On October 23, 1990, Agent Harmon applied for a search warrant seeking permission to search the alleged residence of codefendant Lawrence Padilla, as well as Rosaline "Rose" Gonsalves ("Gonsalves"), at 94–107 Pupuole Place, Apt. A, Waipahu, Oahu, Hawaii. *See* Gov't Ex. D. Generally, the application sought permission to search for: controlled substances, including marijuana and crystal methamphetamine; drug paraphernalia; books and records relating to drug trafficking and drug-related income; and firearms and ammunition. *Id.* Along with the application, Agent Harmon submitted a twenty-three page affidavit. *Id.* On the day the application was made, Judge Pence issued the

---

**35.** Stevens also makes the bald assertion that the search warrant was overbroad. However, as Stevens does not indicate the nature of the alleged overbreadth and no such overbreadth is readily apparent, the court finds no merit to his conclusory allegation.

search warrant requested. *See* Gov't Ex. C.

In his affidavit, Agent Harmon asserted that probable cause existed to believe that a search of the subject residence would uncover the specified evidence relating to illegal drug trafficking. The probable cause showing was evidenced by the undercover work of confidential informant S–20, including purchases of crystal methamphetamine from Gonsalves, and twenty-three drug-related conversations between Stevens and Padilla. Harmon Aff. of 10/23/90, ¶¶ 6–12; *id.* ¶¶ 13(a)–(x). These conversations indicated, among other things, that by late September 1990, Stevens had distributed a quantity of crystal methamphetamine to Padilla for further distribution.

On October 23, 1990, at approximately 6:00 a.m., FBI agents executed the search warrant. Stevens and Joseph were found lying on the living room floor. Stevens was wearing only underwear. It appeared that they had been sleeping before the agents entered. Padilla was located alone in a separate bedroom. He made an effort to grab a .38 caliber Smith and Wesson handgun [36] but was stopped by the agents. The agents seized the weapon. Drug paraphernalia was also seized from various locations in the apartment. No contraband was found on Stevens. However, ten thousand dollars was found in a jacket located in the living room. The jacket was later determined to belong to Stevens.

Stevens and Padilla both seek to suppress the evidence obtained as a result of the search. Padilla argues that the information provided by S–20 cannot support the probable cause finding because there was insufficient evidence of S–20's reliability. According to Padilla, the only information pertaining to S–20's reliability is the following paragraph from Agent Harmon's affidavit:

A confidential source, hereinafter referred to as "S–20," has been providing information to Det. Kamakana. Previous information provided to Det. Kamakana has been corroborated by independent investigation by law enforcement officers and has not been found to be false, inaccurate, or untruthful.

Harmon Aff. ¶ 6.

Nonetheless, the court notes that irrespective of S–20's information there is significant evidence of Padilla's criminal activity contained in the conversations with Stevens which were intercepted pursuant to the Wiretap Order. Upon reviewing Agent Harmon's affidavit in support of the search warrant, the court finds that under the totality of the circumstances Judge Pence had a substantial basis for determining the existence of probable cause based solely upon the intercepted conversations.[37]

█ Although Stevens does not specify the evidence he seeks to suppress, he contends that he was outside of the scope of the search warrant because he was merely a visitor at the premises.[38] Stevens relies on the *Ybarra v. Illinois,* 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979), and its progeny for the proposition that a search warrant does not encompass temporary visitors and their belongings.

The Ninth Circuit has visited this issue on several occasions. In *United States v. Williams,* 687 F.2d 290 (9th Cir.1982), the Ninth Circuit held that a search warrant authorizing the search of a log cabin supported the search of the defendant's lunch box which had his name on it. *Id.* at 293.

**36.** This gun is the subject of a felon-in-possession charge against Stevens.

**37.** Additionally, the court notes that Stevens was named in the search warrant. Stevens argues that the FBI did not have probable cause to believe that he would be present at Gonsalves' apartment at the time the search the FBI executed the search warrant. However, the court need not address this argument as there are other grounds for justifying the seizure of items belonging to Stevens as indicated below.

**38.** The court notes that because the circumstances indicate that Stevens was an overnight guest, he has standing to challenge the search warrant. *Minnesota v. Olson,* 495 U.S. 91, 96–102, 110 S.Ct. 1684, 1688–90, 109 L.Ed.2d 85 (1990) (establishing per se rule that a person's status as an overnight guest is alone enough to show that the guest has an expectation of privacy that society is prepared to recognize as reasonable).

The defendant was not present at the time of the search. The lunch box was located under a work bench in the cabin. *Id.*

In *United States v. Robertson*, 833 F.2d 777 (9th Cir.1987), the Ninth Circuit held that a search warrant for a residence did not encompass the nonconsensual search of an unknown visitor's backpack and purse which the visitor was carrying as she was leaving the house on the walkway. *Id.* at 779, 783–86. The court distinguished its prior ruling in *Williams* as follows:

> We doubt that a lunchbox sitting on the floor of one's residence can be said to be the equivalent of a shoulder bag carried on one's person for the purpose of evaluating privacy concerns. The lunchbox in *Williams* was in a free and stationary position on the premises at the time the search warrant was executed; it was not in the immediate possession of any of the defendants. In [this case], the defendant had the backpack in her possession, and refused to surrender it. It was part of her person in which she possessed a reasonable expectation of privacy. In that sense the backpack is not remotely similar to a lunchbox left resting under a work bench in a cabin.

*Id.* at 784.

Turning to the claims of Stevens and Padilla, the court finds no basis for suppression. The search of Padilla's residence did not result in the seizure of any evidence which was actually found on Stevens. None of the evidence seized was in his immediate possession. Moreover, none of the evidence seized was immediately and plainly identifiable as being property which belonged to Stevens. Finally, the visitor exception to residential search warrants does not apply to Padilla who, at the time of the search, was residing at the residence which was the subject of the search warrant.

### E. Search of Laurie Rellin's Residence on March 4, 1991

On February 27, 1991, State District Court Judge Tenney Z. Tongg issued a search warrant for a residence owned by the family of Laurie Rellin located at 84–116 Jade Street, Makaha, Oahu, Hawaii. Gov't Ex. J. On March 4, 1991, HPD officers executed the search warrant. The officers found six adults located on the premises, including Stevens and codefendant Glenn "Whitey" Sequin, Jr. who were found in the television room. A search of a brown vinyl bag located under a table in the room revealed three glass pipes of the kind used to smoke crystal methamphetamine as well as Stevens' social security card. HPD officers also found a .308 caliber rifle with twenty-nine rounds of ammunition and a box of shotgun shells in the room.

Stevens was arrested on several charges including felon in possession of a firearm and possession of drug paraphernalia. HPD officers found $9,040 in currency in Stevens' jacket. After his arrest, Stevens was transported to the HPD receiving desk where he was again searched incident to his arrest. A small clear plastic bag containing 1.346 grams of cocaine was found in his right rear pocket.

At the suppression hearing, Stevens orally withdrew his motion to suppress the evidence obtained from the March 4, 1991 search.

### F. Interview of Padilla on June 4, 1991

On June 4, 1991, Padilla was interviewed by an HPD officer and an FBI special agent at a holding cell at HPD Headquarters. Padilla was in custody as a consequence of being arrested for assaulting an officer. Padilla has moved to suppress his statements on the ground that he was not given a *Miranda* warning. The government indicates that it does not intend to use any of Padilla's statements from the interview in its case-in-chief. Gov't Mem. (Searches) at 15. Therefore, at this stage of the proceedings, Padilla's motion is moot.

### G. Removal of Listening Device(s) from Stevens' Residence on October 15, 1991

On October 4, 1990, Judge Pence issued an order authorizing the placement

of one or more electronic listening devices in the Stevens residence.[39] Gov't Ex. E. With respect to the removal of the authorized listening devices, the order provided:

> that. *special agents of the FBI,* and officers of the Honolulu Police Department, *are authorized to make all necessary* covert, surreptitious, and/or forcible *entries into the subject premises* located at 84–049 Lawaia Street, Waianae, Hawaii, including any of its rooms and surrounding curtilage, *to effectuate the purposes of this Order, including,* but not limited to, *entries to* install, maintain and *remove electronic listening device(s)* and technical equipment capable of intercepting oral communications and conversations within said premises. The applicant shall notify the Court as soon as possible subsequent to any covert, surreptitious, and/or forcible entry.

Gov't Ex. E at 6 (emphasis added). On October 18, 1990, the government notified the court of the retrieval of the listening devices in accordance with the order of October 4, 1990.

On October 15, 1991, Stevens was arrested, pursuant to the indictments in Cr. Nos. 91–01618 DAE and 91–01621 ACK, by FBI agents at Stevens' residence. After Stevens was placed under arrest, several agents, including Agent Moroney, entered Stevens' bedroom for the purpose of removing one or more of the authorized listening devices. Agent Moroney observed a manila envelope, opened at one end, lying on top of some clothes in a laundry basket which was on top of Stevens' bed. The envelope was addressed to the Bureau of Alcohol, Tobacco and Firearms. Agent Moroney further observed the butt of a handgun protruding from the open end of the envelope. Agent Moroney removed and seized the gun which was identified as a .38 caliber Llama semi-automatic handgun. A sock covered the muzzle of the gun. Within the sock, Agent Moroney found six rounds of .38 caliber ammunition.

Stevens seeks to suppress the gun. Stevens argues that the search which uncovered the gun was outside the scope of a search incident to a lawful arrest. Yet the government maintains that the gun was discovered during the process of removing the listening device(s) pursuant to Judge Pence's order.[40] The government further contends that the gun was in "plain view," as defined by Supreme Court precedent, when Agent Moroney was retrieving the listening device(s) from Stevens' bedroom. *See Horton v. California,* 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990).

At the suppression hearing, Detective Williams, who was also present at Stevens' residence on October 15, 1991, recounted

---

**39.** On October 4, 1990, Agent Moroney filed an application for the order authorizing the interception of oral conversations at the Stevens' residence. The application was supported by Agent Moroney's fifty-four page affidavit. Gov't Ex. H. After Judge Pence issued the order on October 4, 1990, FBI agents entered the Stevens residence to install the authorized listening device(s) at the same time that they were executing a search warrant on October 5, 1990. While the monitoring of oral conversations under the October 4th order terminated on November 4, 1990, no effort was made at that time to reenter the premises and remove the listening device(s). Instead the FBI agents decided to enter and remove the listening device(s) at the same time as when they arrested Stevens.

**40.** The government has represented that it does not intend to attempt to introduce into evidence any of the conversations recorded from the listening device(s) at issue. Nonetheless, at the suppression hearing, Stevens and Joseph objected to the fact that while the electronic listening device(s) was authorized to operate only from October 4, 1990 to November 4, 1990, the FBI waited until October 15, 1991 to retrieve the bug from Stevens' bedroom. The government indicated, however, that the listening device(s) was never in operation after November 4, 1990.

Stevens and Joseph also argued that Judge Pence's order authorizing the bug was overly broad in not requiring removal of the device within a certain amount of time after it was deactivated. The court notes that the government did submit a report to Judge Pence, a couple days following the removal, elaborating on the removal of the bug. More importantly, the court notes that there is no requirement, either statutory or in Judge Pence's order, which requires the government to remove the bug within a certain amount of time. Furthermore, there is no evidence which would suggest that the timing of the government's retrieval of the bug was used as a pretext for an impermissible search.

the events surrounding Agent Moroney's discovery and seizure of the firearm and ammunition at issue. The court found Detective Williams' testimony to be both candid and credible. Stevens presented no evidence to the contrary. As the court finds that Agent Moroney had proper judicial authority to be in Stevens' bedroom to retrieve the listening device(s) and he discovered the firearm in "plain view," the court denies Stevens' motion to suppress the firearm and ammunition.

## CONCLUSION

For the reasons stated above, the court DENIES all of the aforementioned motions to suppress.

IT IS SO ORDERED.